UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ELIZABETH A. D.,

                Plaintiff,

    v.

ANDREW M. SAUL,
Commissioner of Social Security,

                Defendant.

Case No. 19 C 6024

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Elizabeth A. D. brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the Commissioner's decision partially denying her application for disability insurance benefits and supplemental security income. Before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, the ALJ's decision is affirmed, Elizabeth's motion [9] is denied, and the Commissioner's motion [20] is granted.

## BACKGROUND

Elizabeth, now 34 years old, seeks disability benefits based on her bipolar disorder. Elizabeth holds a bachelor's degree in education and last worked in 2015 for Edible Arrangements. Her prior work experience also includes work as a preschool teacher. On September 27, 2018, administrative law judge ("ALJ") James D. Wascher found that Elizabeth was disabled for the period from October 1, 2014 through April 26, 2016 based on her mental impairment meeting Listing 12.04. However, the ALJ determined that Elizabeth experienced medical improvement in her condition related to her ability to work as of April 27, 2016 and that she could perform work at all exertional levels but with certain nonexertional limitations thereafter. In this appeal,

Elizabeth challenges the ALJ's finding that she was not disabled after her closed period of disability.

The ALJ issued his partially favorable decision on September 27, 2018. (R. 14-29). He began by applying the familiar five-step evaluation process. *Id*. at 18; 20 C.F.R. § 404.1520(a)(4). At step three of that process, he concluded that from October 1, 2014 through April 26, 2016, the severity of Elizabeth's bipolar disorder met the criteria of Listing 12.04 of the Listing of Impairments. *Id*. at 18 -21. Applying the Paragraph B criteria, the ALJ found that during that period, Elizabeth's mental impairment caused a mild limitation in understanding, remembering, or applying information, a marked limitation in interacting with others, a moderate limitation in concentrating, persisting, or maintaining pace, and a marked limitation in adapting or managing oneself. *Id*. 19.

Next, the ALJ applied the eight-step process for assessing medical improvement and determined that Elizabeth could work beginning on April 27, 2016. *See* 20 C.F.R. § 404.1594(f). First, he found that Elizabeth had not engaged in substantial gainful activity since her alleged onset date of October 1, 2014 (step one).[1] (R. 18). He next determined that since April 27, 2016, Elizabeth had the impairment of bipolar disorder. *Id*. at 21. However, the ALJ found that beginning April 27, 2016, Elizabeth did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments set forth in the Listing of Impairments (step two). *Id*. at 21-23. Addressing Listing 12.04, the ALJ found that Elizabeth had moderate

---

[1]     For an SSI claim, the performance of substantial gainful activity is not a factor used to determine if the claimant's disability continues, and the analysis starts with step two. 20 C.F.R. § 416.994(b)(5). Steps two through eight of a DIB claim evaluation process are identical to the seven-step process used to evaluate an SSI claim. 20 C.F.R. §§ 404.1594(f), 416.994(b). For convenience, the Court cites only to the DIB regulations.

limitations in understanding, remembering, or applying information, interacting with others, maintaining concentration, persistence, or pace, and adapting or managing oneself. *Id*. at 21-22. The ALJ concluded that the Paragraph B criteria were not satisfied because Elizabeth's mental impairment did not cause at least two "marked" limitations or one "extreme" limitation. *Id*. at 22.

The ALJ then determined that medical improvement occurred as of April 27, 2016, which was related to Elizabeth's ability to work (steps three and four). (R. 23). Specifically, the ALJ found that there was no evidence of any episodes of decompensation since she was discharged from Elgin Mental Health Center on April 26, 2016, her subjective complaints had generally been mild, and all mental status examinations had been completely normal since the end of the closed period. *Id*. The ALJ found that Elizabeth's impairment of bipolar disorder was severe (step six).[2] The ALJ next assessed Elizabeth's RFC, finding that she could perform a full range of work at all exertional levels but with the following nonexertional limitations: she is able to perform simple, routine, repetitive tasks; can have no interaction with general public and only brief superficial interaction with coworkers; no fast-paced production requirements; only simple work-related decisions; and few if any, workplace changes (step seven). *Id*. Finally, the ALJ found that Elizabeth was unable to perform her past relevant work as a preschool teacher (step seven) but could perform a significant number of jobs in the national economy, including officer helper, mail room clerk, and photocopy machine operator (step eight). *Id*. at 27-28. Therefore, the ALJ concluded that Elizabeth's disability ended on April 27, 2016 and she had not become disabled since that date. *Id*. at 29.

---

[2] The ALJ properly skipped step five which was not relevant because the ALJ found that Elizabeth had experienced medical improvement related to her ability to work. *See* 20 C.F.R. § 404.1594(f)(4).

**DISCUSSION**

Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A disability recipient may be found not to be entitled to receive benefits if there is "substantial evidence which demonstrates that (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and (B) the individual is now able to engage in substantial gainful activity." 42 U.S.C. § 423(f)(1). An eight-step sequential evaluation process governs a determination regarding a claimant's medical improvement. 20 C.F.R. § 404.1594.

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In reviewing an ALJ's decision, the Court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusions. *See Steele v. Barnhart*, 290 F.3d 936, 938, 941 (7th Cir. 2002) (internal citation and quotations omitted). Moreover, when the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Id*. at 940.

4

At step eight of the continuing disability analysis, the ALJ found Elizabeth not disabled for the period beginning April 27, 2016 because she retains the RFC to perform other work that exists in the national economy. Elizabeth raises three arguments in support of her request for reversal. She first argues that the ALJ's finding of medical improvement related to her ability to work is not supported by substantial evidence in the record. Second, she contends that the ALJ erred in assessing the medical opinion evidence. Elizabeth lastly argues that the ALJ improperly discounted her subjective symptom statements. None of these arguments demonstrates that the ALJ's decision was not supported by substantial evidence or that the ALJ committed any error.

## A.    Medical Improvement Related to the Ability to Work

Elizabeth argues that the ALJ presented neither explanation nor cited evidence to support his finding of medical improvement. "Medical improvement" is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1); *Varela v. Astrue*, 2012 WL 13076553, at *4 (D. New Mexico March 22, 2012) ("Medical improvement is not synonymous with complete recovery and absence of signs and symptoms; it is merely 'any decrease in medical severity.'"). Such a finding must be based on "improvement in the symptoms, signs, and/or laboratory findings associated with [a claimant's] impairment(s)." *Id*. "Where as here, the ALJ finds the claimant disabled for a closed period in the same decision in which she finds medical improvement, the severity of the claimant's current medical condition is compared to the severity of the condition as of the disability onset date." *Marvietta H. v. Saul*, 2020 WL 7698369, at *5 (N.D. Ill. Dec. 28, 2020).

The ALJ found Elizabeth disabled from October 1, 2014 through April 26, 2016 based on her mental impairment meeting the criteria of Listing 12.04. The ALJ explained that her behavior

during this period demonstrated a marked limitation in interacting with others and a marked limitation in adapting or managing oneself. (R. 20). The ALJ noted that Elizabeth had had multiple episodes of decompensation, with six psychiatric hospitalizations during that period. *Id*. Because Elizabeth's mental impairment caused at least two "marked" limitations in the areas of interacting with others and adapting or managing oneself, the paragraph B criteria were satisfied during the closed period. *Id*.

The ALJ next considered whether Elizabeth's bipolar impairment continued to meet Listing 12.04 as of April 27, 2016. (R. 21-22). Addressing the four areas of mental functioning of Listing 12.04, the ALJ found that Elizabeth's bipolar disorder impairment caused moderate limitations in understanding, remembering, or applying information, interacting with others, maintaining concentration, persistence, or pace, and adapting or managing oneself. *Id*. at 21-22. In making these findings, the ALJ relied on the opinions of the state agency psychological consultants. *Id*. Since Elizabeth no longer had a "marked" limitation in two domains of functioning or an extreme limitation in one domain, the ALJ determined that she was not disabled from her bipolar disorder as of April 27, 2016. *Id*. at 22.

Elizabeth only generally argues that the ALJ's paragraph B findings for the period beginning April 27, 2016 "are unsupported and unsupportable, filled with vague references to the opinions of non-examining State agency consultants and conclusory statements about the record in general." Doc. 9 at 10. She does not specifically address her functioning in the two domains where she had a marked limitation during the closed period, namely, interacting with others and adapting or managing oneself. Nor does Elizabeth identify any functional limitations concerning interacting with others or adapting or managing herself beginning April 27, 2016 that the ALJ failed to address. Moreover, Elizabeth points to no medical evidence in the record other than Dr.

Kadkhodaian's opinion, discussed below, showing that beginning April 27, 2016, she had marked limitations in the areas of interacting with others or adapting and managing herself.

Setting aside the absence of a specific challenge, the Court finds that substantial evidence supports the ALJ's finding that beginning April 27, 2016, Elizabeth was no more than moderately limited in the areas of interacting with others and adapting or managing oneself. The domain of interacting with others "refers to the abilities to relate to and work with supervisors, co-workers, and the public." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E)(2). Examples of such abilities include: "[c]ooperating with others; asking for help when needed; handling conflicts with others; stating your own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." *Id*.

The ALJ determined that beginning April 27, 2016, Elizabeth had a moderate limitation in this domain. (R. 22). The ALJ noted Elizabeth testified that she has no friends or social life, avoids crowded situations, and gets into arguments with bosses, coworkers, and sometimes her father. *Id*. The ALJ also noted that Dr. Kadkhodaian opined that Elizabeth's condition precluded performance of 20 percent of an 8-hour workday for most activities in this domain. *Id*. at 22, 1684. However, the ALJ pointed out that Dr. Kadkhodaian's mental status examinations of Elizabeth between April 28, 2016 and May 26, 2018 were all within normal limits. *Id*. at 22, 25-27, 1672-81, 1774-83, 1786-87, 1807-08. Further, the ALJ noted that Dr. Kadkhodaian did opine that Elizabeth was able to ask simple questions or request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. *Id*. at 22, 1684. Moreover, the ALJ noted that the state agency reviewing psychological consultants opined that Elizabeth had moderate limitations

in this area. *Id*. at 22, 86, 88-89, 103, 106. This evidence supports the ALJ's conclusion that Elizabeth did not have a marked limitation in this domain beginning April 27, 2016.

The domain of adapting or managing oneself "refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E)(4). The regulations identify examples such as "[r]esponding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions." *Id*.

The ALJ determined that Elizabeth had a moderate limitation in adapting or managing oneself after the closed period. (R. 22). The ALJ considered Elizabeth's testimony that she can shower, groom, and dress independently, but she does not shower or change clothes regularly. *Id*. The ALJ also noted that Elizabeth goes grocery shopping but stated that she gets anxiety. *Id*. She testified that her father takes care of her two young children when she has bad days. *Id*. The ALJ noted that Dr. Kadkhodaian opined that for 20 percent of an 8-hour workday, Elizabeth's condition precludes her from responding appropriately to changes in the work setting and setting realistic goals or making plans independently of others. *Id*. at 22, 1684. However, the ALJ observed that Dr. Kadkhodaian's mental status examinations between April 2016 and May 2018 were all within normal limits. *Id*. at 22, 25-27, 1672-81, 1774-83, 1786-87, 1807-08. The ALJ also relied on the opinion of the reconsideration level state agency psychological consultant who opined that Elizabeth had only a mild limitation in this area. *Id*. at 22, 103. In addition, the ALJ noted that the examining state agency psychologist concluded in August 2016 that Elizabeth did not meet the psychiatric criteria for any Listing disorder. *Id*. at 22, 749. The ALJ's conclusion that Elizabeth

had moderate limitation in this domain beginning April 27, 2016 is supported by substantial evidence in the record, including the mental status examinations conducted by Dr. Kadkhodaian and the opinions of examining and non-examining state agency psychological consultants. Thus, Elizabeth fails to show any error by the ALJ in finding her limitation was less than marked in this domain after the closed period.

Moreover, the ALJ appropriately relied upon the opinions of the state agency consulting psychologists in determining that beginning April 27, 2016, Elizabeth did not meet or equal Listing 12.04. Both state agency reviewing psychologists opined that Elizabeth did not meet or equal Listing 12.04 since her alleged onset date of October 1, 2014. (R. 80-92, 95-109). On September 14, 2016, M.W. DiFonso, Psy.D., found that Elizabeth had mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation, each of extended duration. *Id*. at 86. In support, Dr. DiFonso relied upon the psychological consultative examination by Shannon Doyle, Ph.D., LLC. *Id*. at 89. On January 25, 2017 and at the reconsideration level, Russell Taylor, Ph.D., gave a similar justification in determining that Elizabeth had moderate limitations in understanding, remembering, or applying information, interacting with others, and maintaining concentration, persistence, or pace and a mild limitation in adapting or managing oneself. *Id*. at 103, 106-07. Drs. DiFonso and Taylor noted that Elizabeth had recently experienced a period of psychiatric decompensation which resulted in hospitalization but she had resumed a fair set of activities. *Id*. at 89, 107. They concluded that "this episode does not represent an on-going hinderance to participation in productive activity." *Id*. Dr. DiFonso and Dr. Taylor both opined that since October 1, 2014, Elizabeth was capable of multiple step productive activity with modified social demand. *Id*.

Nevertheless, the ALJ determined that the state agency psychological consultants' opinions were inconsistent with the evidence during the closed period and found that Elizabeth was disabled from October 1, 2014 through April 26, 2016 based on her mental impairment meeting the criteria of Listing 12.04. *Id*. at 20. For the period beginning April 27, 2016, the ALJ properly gave both of these opinions some weight in determining that Elizabeth did not meet or equal Listing 12.04. *Id*. at 20, 27; *Scheck*, 357 F.3d at 700 ("The ALJ may properly rely upon the opinion of these medical experts" in finding that a claimant does not meet or equal a listing).

Further, in concluding that Elizabeth did not meet or equal Listing 12.04 beginning April 27, 2016, the ALJ relied upon and cited the opinion of the examining state agency psychological consultant, Shannon Doyle, Ph.D., LLC. (R. 21-22). The psychological evaluation by Dr. Doyle was performed on August 29, 2016 and supports the ALJ's finding that Elizabeth did not meet or equal a listing beginning April 27, 2016. *Id*. at 748-50. Upon mental status examination, Elizabeth's mood was euthymic and her affect was appropriate. *Id*. at 749. Although she incorrectly named five large cities and incorrectly subtracted 7s from 100, Elizabeth's memory was intact and she was able to perform all but one calculation. *Id*. The consultative examiner listed depressive disorder not otherwise specified for Axis 1 and concluded that Elizabeth did not meet the psychiatric criteria for any listing. In sum, the ALJ reasonably relied upon the opinions of the reviewing and examining state agency psychological consultants and they provide substantial evidence necessary to support the ALJ's finding that beginning April 27, 2016, the severity of Elizabeth's mental impairment did not meet or medically equal the criteria of Listing 12.04.

The ALJ next determined that "[m]edical improvement occurred following [Elizabeth's] discharge from Elgin Mental Health Center on April 26, 2016." (R. 23). The ALJ provided adequate explanation and support for his finding that medical improvement occurred as of April

27, 2016, the day after Elizabeth was released from a week stay at Elgin Mental Health Center. The ALJ reasoned that after Elizabeth was discharged on April 26, 2016, there was no evidence of any episodes of decompensation, her subjective complaints had generally been mild, and her mental status examinations had been completely normal since the end of the closed period. *Id*. at 23-25. The ALJ cited and discussed the psychiatric progress notes from Elizabeth's treating psychiatrist, Dr. Kadkhodaian, from April 28, 2016 to May 26, 2018 in concluding that Elizabeth experienced medical improvement. *Id*. at 25-27. These records support the conclusion that Elizabeth's bipolar symptoms improved after her release from Elgin Mental Health Center which coincided with a change in her medication. While Elizabeth was admitted to Elgin Mental Health Center because she expressed suicidal ideation with a plan after finding out she would have to wait to regain custody of her children, her symptoms improved after she was discharged. As the ALJ pointed out, Dr. Kadkhodaian's mental status examination on April 28, 2016, two days after Elizabeth's final hospital discharge, was completely within normal limits. *Id*. at 25, 1672-73. The medical records thereafter showed that Elizabeth continued to be treated for her bipolar disorder, but her condition responded favorably to treatment so that for the next two years her mental status examinations were all completely normal. Medical improvement had occurred because there had been a decrease in the severity of her impairment as documented by the current symptoms and signs reported by Dr. Kadkhodaian, her treating psychiatrist.

Elizabeth argues that the ALJ's reliance on the absence of psychiatric hospitalization after April 26, 2016 is flawed because "episodes of decompensation" is no longer one of the paragraph B criteria. Citing *Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015), Elizabeth also argues that the Seventh Circuit has "repeatedly held that it is a regrettable misconception of mental illness to infer from the absence of inpatient psychiatric treatment that an individual's symptoms no longer

exist." Doc. 9 at 9; *see Voigt*, 781 F.3d at 876 (noting "[t]he institutionalization of the mentally ill is generally reserved for persons who are suicidal, otherwise violent, demented, or (for whatever reason) incapable of taking even elementary care of themselves.").

Elizabeth is correct that the paragraph B criteria no longer requires repeated episodes of decompensation. The new paragraph B criteria, which applied when the ALJ issued his decision, replaced the repeated episodes of decompensation criterion with "adapting or managing oneself." 81 FR 66138, 2016 WL 5341732 (Sept. 26, 2016). The ALJ correctly applied the revised paragraph B criteria for Listing 12.04 in his decision. (R. 19, 21-22). It was also appropriate for the ALJ to consider that Elizabeth had no psychiatric hospitalizations after April 26, 2016 as a factor in evaluating whether she had experienced any decrease in symptoms given that she had been repeatedly hospitalized for mental health episodes before that date. Although it is true that the absence of psychiatric hospitalizations standing alone does not necessarily mean an individual does not met or equal a listed impairment or is able to work, it may suggest less severe symptoms managed with more conservative treatment where a claimant has a history hospitalizations.

Contrary to Elizabeth's argument, the ALJ did not find Elizabeth was free of symptoms after the closed period; he found that Elizabeth continued to suffer from bipolar disorder and experienced moderate limitations in understanding, remembering or applying information, interacting with others, maintaining concentration, persistence, or pace, and adapting or managing oneself. The ALJ also included non-exertional limitations in the RFC to account for the effect of Elizabeth's bipolar disorder: (R. 21, 23). Moreover, the fact that Elizabeth continues to suffer from some symptoms of her bipolar disorder does not disprove that medical improvement occurred as of April 27, 2016. *See Blevins v. Astrue*, 451 F. App'x 583, 585 (7th Cir. 2011) (ALJ's finding of medical improvement supported by substantial evidence where claimant's GAF score decreased

from the range of serious to moderate symptoms or difficulty in functioning); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989); *Maudlin v. Astrue*, 2015 WL 5212049, at *5 (S.D. Ohio, Sept. 8, 2015) ("'Medical improvement' is not synonymous with 'full recovery.'").

Elizabeth complains that the ALJ's finding of medical improvement on April 27, 2016 occurred "abruptly" and "overnight." Doc. 9 at 9-10. "But, the law requires that in determining medical improvement, an ALJ select a specific date." *Murphy v. Berryhill*, 2017 WL 1100908, at *7 (N.D. Ill. Mar. 22, 2017). The record fully supports the ALJ's conclusion that Elizabeth's bipolar impairment was significantly stabilized after she was discharged from the Elgin Mental Health Center on April 26, 2016. The medical records beginning April 27, 2016 show that Elizabeth's improvement was sustained, and Elizabeth points to no treatment records which indicate that a decrease in her psychiatric symptoms had not occurred as of April 27, 2016. Even Dr. Kadkhodaian acknowledged that Elizabeth was stable on her medications. (R. 1684, 1174). Thus, substantial evidence supports the ALJ's selection of April 27, 2016.

Elizabeth also asserts that the April 27, 2016 date chosen by the ALJ as the date of medical improvement was an "arbitrary cutoff date" because she was not able to get her children returned to her until April 2017, a full year after her discharge from Elgin Mental Health Center. Doc. 9 at 10. The ALJ's decision to fix the date of medical improvement as April 27, 2016 was not arbitrary. The Illinois Department of Children and Family Services ("DCFS") likely uses different standards for assessing functional limitations before returning custody to a parent than those required for determining whether a claimant is disabled within the meaning of the Social Security Act. The ALJ was not bound by DCFS's assessment of Elizabeth's condition as to child custody in assessing her eligibility for social security disability benefits.

Elizabeth next argues that the ALJ failed to explain his decision that her medical improvement was related to her ability to work. Under the regulations, medical improvement must also be related to a claimant's ability to work. 20 C.F.R. § 404.1594(a). As the Commissioner notes, "[t]he regulations provide that a claimant has medically improved in a manner related to her ability to work if she no longer meets a listing that she had met at the time of the last favorable decision." *Frazee v. Berryhill*, 733 F. App'x 831, 834 (7th Cir. 2018); *see* 20 C.F.R. § 404.1594(c)(3)(i) ("If there has been medical improvement to the degree that the requirement of the listing section is no longer met or equaled, then the medical improvement is related to your ability to work."). The ALJ sufficiently explained that the medical improvement that occurred was "related to the ability to work because [Elizabeth] no longer [had] an impairment or combination of impairments that meets or medically equals the severity of a listing." (R. 23). Because the ALJ's finding of medical improvement was based on Elizabeth no longer meeting Listing 12.04, the ALJ correctly determined that the improvement was related to her ability to work and proceed to analyze her current RFC. 20 C.F.R. § 404.1594(c)(3)(i) ("We must, of course, also establish that you can currently engage in gainful activity before finding that your disability has ended.").

Accordingly, the Court concludes that the ALJ's determination that Elizabeth experienced improvement related to her ability to work as of April 27, 2016 is supported by substantial evidence in the record, including the psychiatric progress notes from Dr. Kadkhodaian, as well as the reports of the examining and non-examining state agency psychological consultants.

**B.    Medical Opinion Evidence**

Elizabeth argues that the ALJ failed to properly weigh the medical opinion evidence. She primarily takes issue with the ALJ's weighing of the opinion of her treating psychiatrist, Dr.

Hooshmand Kadkhodaian, and the state agency reviewing psychologists' opinions. The ALJ assigned "little weight" to Dr. Kadkhodaian's opinion and "some weight" to the state agency reviewing physicians' opinions for the period beginning on April 27, 2016. (R. 20-21, 27).

Elizabeth argues that Dr. Kadkhodaian's opinion was entitled to greater weight. The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record" 20 C.F.R. § 404.1527(c)(2); *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (the treating physician rule governs claims filed before March 27, 2017). An ALJ must "offer good reasons for discounting a treating physician's opinion." *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted); *see also Walker v. Berryhill,* 900 F.3d 479, 485 (7th Cir. 2018). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *see* 20 C.F.R. § 404.1527(c). "[I]f the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

Dr. Kadkhodaian had treated Elizabeth since January 15, 2016 and opined on May 26, 2018 that her mental impairment precluded her from performing 12 of 20 specific functions for at least 20% of the workday. (R. 1682-85). Specifically, Dr. Kadkhodaian found that Elizabeth's bipolar disorder precluded her performance of the following mental abilities for 20% of an 8-hour workday: (1) carry out detailed instructions; (2) maintain attention and concentration for two hours

while performing a simple task; (3) perform activities within a schedule, maintain regular attendance, and be punctual and within customary tolerances; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or in proximity to others without being distracted by them; (6) complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a constant pace without an unreasonable number and length of rest periods; (7) interact appropriately with the general public; (8) accept instructions and respond appropriately to criticism from supervisor; (9) get along with coworkers or peers without distracting them or exhibiting behavior extremes; (10) respond appropriately to changes in the work setting; and (11) set realistic goals or make plans independently of others. *Id*. at 1683-84. Dr. Kadkhodaian also found that for 30% or more of an 8-hour workday, Elizabeth's bipolar disorder precluded her from understanding and remembering detailed instructions. *Id*. at 1683. The ALJ gave Dr. Kadkhodaian's opinion "little weight" when considering the closed period from October 1, 2014 through April 26, 2016 and when considering the period beginning April 27, 2016. *Id*. at 20-21, 27.

As to the closed period from October 1, 2014 through April 26, 2016, the ALJ offered a good reason for giving Dr. Kadkhodaian's opinion little weight. The ALJ found Dr. Kadkhodaian's opinion "less probative" because Dr. Kadkhodaian first treated Elizabeth on January 15, 2016, only three months before the end of the closed period, and rendered the opinion on May 26, 2018, two years after the closed period ended. (R. 20-21). A treating physician's opinion is given more weight because he is "more likely to have a detailed and longitudinal view" of the claimant's impairments. *Scheck*, 357 F.3d at 702. No such credit is warranted "when in fact, there is no detail or longitudinal view." *Id*. The ALJ properly assigned little weight to Dr. Kadkhodaian's opinion during the closed period on this basis.

The Court also finds no error in the ALJ's assessment of the opinion of Dr. Kadkhodaian for the period beginning April 27, 2016. The ALJ provided good reasons for assigning Dr. Kadkhodaian's opinion little weight for this period. He found Dr. Kadkhodaian's opinion "quite inconsistent with his reviews of systems and mental status examinations . . . for the period of time after the closed period." (R. 27).

First, the ALJ cited Dr. Kadkhodaian's review of systems which regularly demonstrated generally mild subjective complaints that were inconsistent with his suggested limitations. (R. 25-27). Dr. Kadkhodaian's records indicate that on May 26, 2016, Elizabeth reported that she was "doing fine" and adhering to her medication with no side effects. *Id*. at 25, 1674. On June 23, 2016, Elizabeth reported to Dr. Kadkhodaian that she was "doing better, more in control of her temper, and her father commented that she [was] calmer." *Id*. at 25, 1676. Dr. Kadkhodaian observed that Elizabeth "appear[ed] in good spirits." *Id*. A psychiatric progress note on August 18, 2016 reflects that Elizabeth reported that she was "doing ok" and adhering to her medication, with no side effects reported. *Id*. at 25, 1678. On October 21, 2016, Dr. Kadkhodaian wrote that Elizabeth reported that "she is doing well." *Id*. at 26, 1680. Dr. Kadkhodaian observed that Elizabeth appeared to be calm and appropriate. *Id*. On January 28, 2017, Elizabeth reported to Dr. Kadkhodaian that she was "doing ok" and "her mood [was] stable." *Id*. at 26, 1782. Three months later, on April 27, 2017, Elizabeth reported that she had gotten her two children back and was taking care of them. She additionally reported that she noticed a change in herself in that she wasn't having explosive episodes and was able to control her anger. *Id*. at 26, 1807. She stated that "she [was] learning parenting." *Id*. As the ALJ noted, Dr. Kadkhodaian decreased Elizabeth's dosage of Lithium and Lorazepam, reflecting an improvement in symptomatology. *Id*. at 26, 1808.

Elizabeth treated again with Dr. Kadkhodaian on October 26, 2017, January 25, 2018, March 23, 2018, and May 26, 2018. Dr. Kadkhodaian wrote that at the October 26, 2017 appointment, Elizabeth reported that she was "doing well" and "her mood [had] been stable," with no lithium-related side effects. (R. 26, 1786). On January 25, 2018, Elizabeth reported to Dr. Kadkhodaian that she was "doing very well," was taking care of her two children, and her medications were effective. *Id*. at 26, 1778. Elizabeth "talk[ed] about going to work once her two children start going to school." *Id*. at 26, 1778. Elizabeth endorsed a stable mood. *Id*. No lithium-related side effects were reported. *Id*. at 27, 1779, 1780. Dr. Kadkhodaian noted that Elizabeth "appear[ed] to be appropriate" and "in [a] good mood." *Id*. at 27, 1780. The psychiatric progress notes from March 23, 2018 indicate that Elizabeth reported that she was taking her medications regularly, but had missed taking Risperdal several times due to some confusion with the pharmacy. *Id*. at 27, 1776. Despite missing some doses of Risperdal, all aspects of Elizabeth's mental status examination were within normal limits. *Id*. at 27, 1776-77. Lastly, on May 26, 2018, Elizabeth reported that she was doing well and spending time taking care of her two children and gardening. *Id*. at 27, 1774. She described incidents where she had arguments with her father for "stupid things." *Id*. Dr. Kadkhodaian noted no Lithium-related sided effects. *Id*. He concluded that Elizabeth was "stable on meds." and directed her to return in three months. *Id*. at 27, 1774-75.

Second, the ALJ reasonably cited Dr. Kadkhodaian's treatment notes for the period of time after the closed period for support. (R. 25-27); *see Harris v. Saul*, --- F. App'x ----, 2020 WL 7078706, at *3 (Dec. 3, 2020) ("the ALJ was aware that Dr. Lee was Harris's treating psychiatrist who examined her monthly for at least three years, but he reasonably focused on how Dr. Lee's conclusions were unsupported by, and inconsistent with, his notes in the record."). Dr. Kadkhodaian treated Elizabeth between January 2016 and May 2018. The ALJ correctly noted

that at 11 psychiatric examinations during the period beginning April 27, 2016, Dr. Kadkhodaian routinely rated all aspects of Elizabeth's mental status examinations within normal limits. (R. 25-27). Specifically, Elizabeth's metal status examinations consistently reflected that her appearance/hygiene, behavior, speech, mood/affect, perceptual process, thought process, thought content, and memory were normal. *Id*. at 1672-81, 1774-83, 1786-87, 1807-08. On each occasion, her risk of harm to self/others was low, her insight was good, and she was oriented x4. *Id*. Because the record as a whole supports the ALJ's decision to afford little weight to Dr. Kadkhodaian's opinion and he adequately explained his decision, the Court finds no error in the ALJ's refusal to adopt Dr. Kadkhodaian's May 26, 2018 opinion.

Elizabeth faults the ALJ for affording little weight to Dr. Kadkhodaian's opinion while assigning "some weight" the state agency reviewing psychologists for the period after April 26, 2016. Drs. DiFonso and Taylor found that Elizabeth's residual depressive symptoms moderately limited her ability to carry out detailed tasks and manage intensively demanding social situations. (R. 89, 107). They opined that Elizabeth could perform one-two step tasks as well as multiple step tasks and recommended moderate limit of social expectations. *Id*. The ALJ explained that Dr. DiFonso's and Dr. Taylor's opinions were inconsistent with the evidence during the closed period but generally consistent with the RFC for the period beginning April 27, 2016. *Id*. at 20. Therefore, the ALJ assigned Dr. DiFonso's and Dr. Taylor's opinions "some weight" for the period beginning April 27, 2016. *Id*. at 27.

Elizabeth claims that "[o]ddly, though the ALJ expressly disagreed with their determinations regarding no disability prior to April 27, 2016, he assigned their opinions partial weight – primarily because they are 'experienced.' This makes no sense, if the State agency psychologists were 50 percent right and 50 percent wrong, one wonders why their opinions were

at all reliable." Doc. 9 at. 13.   "While an ALJ need not accept all of a doctor's recommendations and findings, she must—at minimum—build an accurate and logical bridge from the evidence to her conclusion.".  *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018).  Moreover, an ALJ must explain the weight given to a state agency psychologist's opinion. *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th  Cir. 2011).

Here, the ALJ adequately explained his reasoning for relying on the opinions of the state agency reviewing psychologists for the period beginning on April 27, 2016 and not relying on them for the closed period.  When assessing Drs. DiFonso's and Taylor's opinions, the ALJ properly recognized that the record as a whole warranted more restrictive interacting with others and adapting or managing oneself limitations than those found by them during the closed period. The ALJ reasonably determined that Drs. DiFonso's and Taylor's "assessments of the 'paragraph B' criteria appear[ed] to give greater weight to evidence after [Elizabeth's] hospitalization, including the August 2016 consultative examination," which was "inconsistent with the evidence during the closed period." (R. 20).  For example, the ALJ noted that during this period, Elizabeth had depressive symptoms of depressed mood, appetite disturbance, sleep disturbance, difficulty concentrating, and suicidal ideation and attempts and manic symptoms of flight of ideas, decreased need for sleep, distractibility, high risk activities, and increased goal directed activities or psychomotor agitation. *Id*. at 19.  The ALJ noted that from October 1, 2014 through April 26, 2016, Elizabeth had multiple episodes of decompensation, with six psychiatric hospitalizations. *Id*. 19-20.  As a result, the ALJ determined that prior to April 27, 2016, Elizabeth had a marked limitation in interacting with others and a marked limitation in adapting or managing herself. *Id*. at 19.

For the period after April 26, 2016, the ALJ assigned "some weight" to the non-examining state agency psychological consultants' opinions that Elizabeth was "capable of multiple step productive activity [with] modified social demand." (R. 27, 89, 107). Drs. DiFonso and Taylor considered the opinion of the examining consulting psychologist Dr. Doyle, who examined Elizabeth in August 2016. Drs. DiFonso and Taylor wrote that Dr. Doyle's examination documented that: Elizabeth's cognitive and attentional skills were intact and adequate for simple one-two step tasks as well as multiple step tasks; she performed reasonably well on cognitive tasks on mental status examination; she carried out a fair set of activities of daily living; her interpersonal skills were appropriate in the interview; and she was a reliable reporter with adequate hygiene, mood euthymic, and affect appropriate. *Id*. at 89, 107. Dr. DiFonso and Taylor opined that Elizabeth's residual symptoms moderately limited her ability to carry out detailed tasks and manage intensively demanding social situations. *Id*.

The ALJ provided legitimate reasons for giving some weight to the state agency psychological consultants' opinions for the period beginning on April 27, 2016. The ALJ explained that he did so because "they are trained in evaluating Social Security disability claims, reviewed the evidence that was made available to them, and made reasonable, well-supported conclusions based on that evidence, supported by detailed explanation, rationale, and analysis of the medical record." *Id*. The ALJ also explained that additional evidence received after the state agency psychological consultants' review further supported the conclusion that Elizabeth's condition had improved since April 26, 2016. *Id*. Elizabeth does not deny that "state agency . . . psychological consultants are highly qualified and experts in Social Security evaluation." 20 C.F.R. § 404.1513a(b)(1); SSR 96-6p, 1996 WL 374189, at *2 (July 2, 1996) ("State agency medical and psychological consultants are highly qualified physicians and psychologists who are

experts in the evaluation of the medical issues in disability claims under the Act."). As such, the ALJ was justified in relying upon the reports of the state agency reviewing psychological consultants in deciding whether Elizabeth met or equaled Listing 12.04 and in reaching Elizabeth's RFC for the period beginning on April 27, 2016. 20 C.F.R. § 404.1526(c); *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004); *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation."); *Scheck*, 357 F.3d at 700. Accordingly, Elizabeth has failed to show that the ALJ erred when he afforded some weight to the opinions of the state agency psychological consultants but also included additional non-exertional limitations in the RFC determination than those opined by the state agency psychologists. (R. 23, 89, 107).

Elizabeth insists that "one has to wonder why the experience of a non-examining physician would override that of a long term treater, contrary to Social Security rules and regulations." Doc. 9 at 13. However, "[t]he Seventh Circuit has held that an ALJ may rely on the opinions from State agency physicians when they are consistent with the record." *Mary Ann R. v. Saul*, 2019 WL 4645445, at *6 (N.D. Ill. Sept. 24, 2019). The state agency reviewing psychologists' opinion were generally consistent with the record after April 26, 2016, including the treatment records from Dr. Kadkhodaian, Elizabeth's contemporaneous statements about her symptoms, and the findings at the consultative examination from August 2016. Other than Dr. Kadkhodaian's May 2018 opinion, Elizabeth fails to point to any other opinion that supports her disability claim for the time period after the closed period. As explained above, the ALJ reasonably afforded little weight to Dr. Kadkhodaian's May 2018 opinion because it was inconsistent with the record, including his own notes which showed normal mental status examinations from April 2016 when Elizabeth was discharged from Elgin Mental Health Center until May 2018. Elizabeth does not identify any other

22

inconsistencies between the state agency psychological consultants' opinions and the medical evidence of record for the period beginning April 27, 2016.

Finally, Elizabeth suggests that the ALJ should have given greater weight to her global assessment of functioning ("GAF") scores. "The GAF, which assesses an 'individual's overall level of functioning,' no longer is widely used by psychiatrists and psychologists." *Winsted v. Berryhill*, 923 F.3d 472, 474 n. 1 (7th Cir. 2019); *Sambrooks v. Colvin*, 566 F. App'x 506, 511 (7th Cir. 2014) ("a GAF score is nothing more than a snapshot of a particular moment."). "Although another metric has replaced the GAF, the agency still considers these scores as relevant, medical-opinion evidence." *Knapp v. Berryhill*, 741 F. App'x 324, 329 (7th Cir. 2018); *Gerstner v. Berryhill*, 879 F.3d at 263 n.1.

Consistent with these authorities, the ALJ assessed Elizabeth's GAF scores during the closed period as medical opinion evidence. The ALJ noted that the record during the period from October 1, 2014 through April 26, 2016 contains multiple GAF scores largely assessed during Elizabeth's psychiatric hospitalizations and generally in the 25-30 range, indicating serious impairment. [3] (R. 21). The ALJ gave "little weight" to the GAF scores when assessing the period from October 1, 2014 through April 26, 2016. *Id*. The ALJ stated that he generally gave "less weight to a specific GAF score than to the bulk of other, more convincing evidence." *Id*. The ALJ reasoned that a "GAF scores represents a particular clinician's subjective evaluation at a single point in time," the "GAF score may vary from day to day, from time to time, and between practitioners," and "the GAF score is not designed for adjudicative determinations." *Id*. The ALJ concluded that "[o]ther evidence may outweigh GAF scores, and in this case, the other evidence

---

[3]    As the Commissioner points out, Elizabeth does not present any evidence of low GAF scores after April 26, 2016.

is more informative and is given more weight, as described above." *Id.* The ALJ was referring to his consideration of Elizabeth's symptoms, treatment records, and the medical opinion evidence during the period from October 1, 2014 through April 26, 2016. *Id.* at 19-21.

Elizabeth argues that the ALJ's assignment of little weight to the GAF scores was arbitrary because of the consistency of her GAF scores with her records. The Court agrees that the ALJ failed to explain how the low GAF scores during Elizabeth's psychiatric hospitalizations were inconsistent with the record during the closed period. However, any possible error in discounting the GAF scores during the closed period was harmless because greater weight to the GAF scores would "involve the same . . . ultimate conclusion." *Lloyd v. Berryhill*, 682 F. App'x 491, 496 (7th Cir. 2017);. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (error is harmless when it "would not affect the outcome of th[e] case."). While the ALJ gave little weight to the GAF scores during the closed period, he ultimately determined that Elizabeth was disabled from October 1, 2014 until April 26, 2016. Thus, the ALJ's failure to give greater weight to Elizabeth's GAF scores during the closed period had no material effect on the outcome of the disability determination for that period because the ALJ made functional findings consistent with the low GAF scores during the closed period. *Cf. Yurt v. Colvin*, 758 F.3d 850, 859-60 (7th Cir. 2014) (finding that although the ALJ was not required to give any weight to individual GAF scores, "the problem here is not the failure to individually weigh the low GAF scores but a larger general tendency to ignore or discount evidence favorable to [Plaintiff's] claim, which included GAF scores from multiple physicians suggesting a far lower level of functioning than that captured by the ALJ's hypothetical and mental RFC."). Elizabeth fails to explain how her GAF scores in the serious range during the closed period suggest more serious limitations than the ALJ assigned. Even if the ALJ had given greater weight to Elizabeth's low GAF scores during the closed period,

it would not have changed the ALJ's determination that Elizabeth was disabled during the closed period.

Finally, Elizabeth notes that the ALJ neglected to mention the portion of Dr. Doyle's opinion that found Elizabeth was incapable of handling her own financial affairs. (R. 750). The ALJ's failure to address Dr. Doyle's finding that she was incapable of handling her own financial affairs is not a basis for reversal. Notably, Elizabeth does not specify how her inability to handle her financial affairs further impaired her ability to work. Additionally, "an ALJ need not provide a complete written evaluation of every piece of testimony and evidence [as long as the Court can] track the ALJ's reasoning and be assured that the ALJ considered the important evidence . . . ." *Diaz v. Chater*, 55 F.3d 300, 307–08 (7th Cir. 1995); *Knox v. Astrue*, 327 F. App'x 652, 657-58 (7th Cir. 2009) (the "ALJ need not provide a written evaluation of every piece of evidence, but need only 'minimally articulate' his reasoning so as to connect the evidence to his conclusions.").

The ALJ met the minimal articulation requirement here, explicitly considering Dr. Doyle's report. (R. 25). He discussed Dr. Doyle's findings that Elizabeth's mood was euthymic, her affect was appropriate, she drove herself to the appointment, she incorrectly named five large cities and subtracted 7s from 100, her memory was intact, and she was able to perform all but one calculation. *Id*. He noted that despite Elizabeth being diagnosed with bipolar disorder, Dr. Doyle listed depressive disorder not otherwise specified for axis I and concluded that she did not meet the psychiatric criteria for any listing. *Id*. For the period beginning on April 27, 2016, the ALJ also relied in part upon the state agency psychological consultants who took into account Dr. Doyle's report. *Id*. at 89, 101-02, 106-7. The reconsideration level state agency psychological consultant expressly noted Dr. Doyle's finding that Elizabeth was "[n]ot able to handle funds." *Id*. at 101. Thus, although the ALJ did not explicitly mention Dr. Doyle's finding that Elizabeth was incapable

of handling her own funds, it was factored indirectly into the ALJ's decision as part of the state agency psychological consultants' opinions. Moreover, Dr. Doyle assigned a GAF score of 60, which indicates "moderate difficulties with social and occupational functioning" and is consistent with the RFC for the period beginning April 27, 2016. *Lothridge v. Saul*, --- F.3d ----, 2021 WL 37503, at *2 (Jan. 5, 2021). While that score is not controlling, Elizabeth does not explain how Dr. Doyle's limitation of not being capable of managing her funds undermines the RFC found by the ALJ.

## C.    Subjective Symptom Evaluation

Elizabeth argues that the ALJ erred in assessing alleged symptoms resulting from her bipolar disorder. The Court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is "patently wrong," meaning "the decision lacks any explanation or support." *Burmester*, 920 F.3d at 510; *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). When assessing a claimant's subjective symptom allegations, an ALJ must consider several factors, including the objective medical evidence, the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8 (Oct. 25, 2017). Ultimately, "the ALJ must explain h[is] [subjective symptom evaluation] in such a way that allows [the Court] to determine whether []he reached h[is] decision in a rational manner, logically based on h[is] specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (internal quotations omitted).

The ALJ summarized Elizabeth's testimony, including that: she and her 5-year-old and 3-year-old children live with her father; her father has a housekeeper who does all the household chores except cooking and they eat out often; she can shower groom and dress independently, but does not shower or change clothes regularly; she reported having nightmares all the time and

tossing and turning in bed; her father reminds her to take medication daily because her memory and concentration are poor; she is easily distracted; she starts things and forgets what she is doing; she testified she has no friends or social life; she avoids crowded situations; she goes grocery shopping, but gets anxiety; she has repetitive thought and constantly worries about the house burning down. (R. 24). The ALJ considered Elizabeth's subjective symptom allegations but found them "not entirely consistent with the medical evidence and other evidence in the record." *Id.* At the same time, the ALJ credited some of Elizabeth's symptoms by limiting her to performing work involving simple, routine, repetitive tasks; no interaction with the general public and only brief superficial interaction with coworkers; no fast-paced production requirements; only simple work-related decisions; and few, if any, workplace changes. *Id.* at 23.

Elizabeth accuses that the ALJ of rejecting her subjective symptoms because he believed she was untruthful. Doc. 9 at 14-15. Elizabeth is correct that SSR 16-3p prohibits an ALJ from "simply reject[ing] a [claimant's] claims because he believes she is untruthful." Doc. 9 at 14; Social Security Ruling 16-3p, 2017 WL 5180304, at *11 ("our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus [ ] should not be to determine whether he or she is a truthful person."). The Court does not read the ALJ's decision as making a finding as to Elizabeth's general truthfulness, as Elizabeth asserts. Rather, for the period beginning April 27, 2016, the ALJ appropriately focused on the inconsistencies between her alleged disabling mental symptoms and the evidence, including her consistently normal mental status examination findings, lack of psychiatric hospitalization, stability on medication, own reports of mild symptoms, and the medical opinions of the consultative psychologists.

The ALJ's finding that Elizabeth's statements about the severity of her symptoms were inconsistent with record was sufficiently supported. The ALJ provided a number of specific and legitimate reasons for finding Elizabeth's allegations of disabling mental symptoms inconsistent with the medical record beginning on April 27, 2016, including that the medical evidence did not corroborate her subjective symptom statements. SSR 16-3p, 2017 WL 5180304, at *5 ("[O]bjective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms."). The ALJ noted: (1) there was no evidence of any episodes of decompensation since Elizabeth's discharge from her last hospitalization on April 26, 2016; (2) she reported generally mild subjective symptoms to Dr. Kadkhodaian; and (3) mental status examinations with Dr. Kadkhodaian were repeatedly normal. (R. 25). Consistent with Elizabeth's own reports to Dr. Kadkhodaian that she was "doing ok" and "doing well," the ALJ further noted that Elizabeth reported that her medications were effective with no side effects, which is a valid reason to discount her subjective symptom allegations. *Id*. at 25-27; *see Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (affirming ALJ's credibility determination where claimant's "testimony that her sleeping disorder prevented her from working was inconsistent with her testimony that ... medication kept it under control."); *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002) ("[T]he ALJ noted that Donahue relied for pain control on over-the-counter analgesics and reported that these gave him good relief, from which the ALJ inferred that the level of pain could not be severe."). In addition to the medical record, the ALJ noted that Elizabeth regained custody of her two young children, she reported no longer having explosive episodes and being able to control her anger, and she talked about going to work once her two children started school. *Id*. at 26. All of these reasons are specific and supported by the record. Because the ALJ's rationale for discrediting Elizabeth's testimony concerning the severity

of her subjective symptoms was supported by specific reasons and not patently wrong, the Court will not reverse on this basis.

Elizabeth takes issue with the ALJ's reliance on the absence of psychiatric hospitalizations to suggest that she was exaggerating her symptoms. Again, it is true that an absence of hospitalizations does not necessarily mean that a claimant is able to work, but the ALJ properly considered that the lack of psychiatric hospitalizations after the closed period reflected substantial improvement in Elizabeth's psychiatric symptoms which undermined her allegations of disabling mental symptoms. The ALJ did not find that the lack of psychiatric hospitalizations demonstrated that Elizabeth had no limits on her ability to function or necessarily meant she could perform full-time work. *See Voigt*, 781 F.3d at 876; *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("Concluding that the claimant is not a raving maniac who needs to be locked up is a far cry from concluding that she suffers no limits on her ability to function.") (internal quotation and citation omitted); *Mattson v. Berryhill*, 2017 WL 5011890, *5 (N.D. Ill. Nov. 2, 2017) ("It is plausible that one may be unable to work but not need psychiatric hospitalization."); *Adams v. Berryhill*, 2017 WL 4349718, *12 (N.D. Ind. Oct. 2, 2017) ("While inpatient hospitalization can be indicative of serious mental health symptoms, a lack of hospitalization does not necessarily mean that the individual's symptoms are not disabling."). However, to the extent that it was unreasonable for the ALJ to discount Elizabeth's subjective reports of her symptoms after the closed period based on the lack of psychiatric hospitalization, it does not render the ALJ's subjective symptom assessment patently wrong. *See Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as *enough* of them are.") (emphasis in original). As noted, the ALJ also considered the objective medical evidence, Elizabeth's medications, treatment,

and her self-reported symptoms to her treating psychiatrist. *See* SSR 16-3p, 2017 WL 5180304 at *7-8.

Next, Elizabeth says "[i]ronically, [the ALJ] also relied upon [Elizabeth's] own subjective complaints, which he described as mild," to justify his symptom assessment. Doc. 9 at 15. As such, she claims, the ALJ's "suggestion that she was not being truthful is not only impermissible but makes no sense." *Id*. Elizabeth then devotes the remainder of this portion of her opening brief to summarizing her hearing testimony and concludes that these "'complaints' were hardly mild." Doc. 9 at 15.

Elizabeth's challenge is unavailing. First, the ALJ was not required to accept all of Elizabeth's subjective allegations given a lack of corroborating medical evidence and other inconsistencies in the record for the period beginning April 27, 2016. *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014) ("That does not mean that the ALJ was required to credit [claimant's] testimony. The ALJ could properly have considered whether [claimant's] testimony was credible and whether the evidence supported such limitations, including assessing whether the migraines were less debilitating after the stimulator implantation."). Second, the ALJ appropriately considered the discrepancies between Elizabeth's testimony regarding her symptoms and her own self-reported symptoms to Dr. Kadkhodaian. The ALJ was entitled to discount Elizabeth's symptom allegations because they were inconsistent with her contemporaneous reports to her treating psychiatrist within the relevant time period. SSR 16-3p, 2017 WL 5180304, at *7 ("Very often, the individual has provided . . . information [about symptoms] to the medical source, and the information may be compared with the individual's other statements in the case record."); *see also Murphy v. Berryhill*, 727 F. App'x 202, 207 (7th Cir. 2018) (ALJ's adverse credibility finding was "properly based on the incongruity between the relatively modest symptoms [claimant]

reported to her doctors and the more severe symptoms [claimant] ... reported to the ALJ."); *Cohen v. Astrue,* 258 F. App'x 20, 26 (7th Cir. 2007) (fact that claimant's "hearing testimony contradicted her contemporaneous reports to physicians and their independent observations ... is a legitimate basis for affording little weight to her testimony").  As explained, the ALJ considered Elizabeth's testimony regarding her psychiatric symptoms and resulting limitations. (R. 24).  The ALJ also considered Elizabeth's statements about her mental health to Dr. Kadkhodaian over a period of more than two years. *Id*. at 25-27.  The ALJ determined that Elizabeth's subjective complaints had generally been mild during the period beginning on April 27, 2016. *Id*. at 25.  In this context, the ALJ reasonably found Elizabeth's testimony about the severity of her symptoms not consistent with her own reports of her functioning during the time period after the closed period.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [9] is denied, the Commissioner's Motion for Summary Judgment [20] is granted, and the ALJ's decision is affirmed.  The Clerk is directed to enter judgment in favor of the Commissioner and against Plaintiff.

**SO ORDERED.**

Dated:  January 15, 2021

_____
Sunil R. Harjani
United States Magistrate Judge